Andrew Moskowitz, on behalf of the Plaintiff, Bruce Borzon, Your Honors, this Court has observed that there is a need for caution in granting summary judgment in employment cases, and the reason for that is that employers, particularly in this day and age, are unlikely to leave the smoking gun admitting a discriminatory or retaliatory motive. I believe in this case that the evidence, the cumulative weight of the evidence demonstrates was sufficient to create an issue of material effect. You have first, specifically, the statement my client reported that Tracy Green was out to get him. That's what Mr. Guzman told him. Now, how could that statement be admissible under the hearsay rule? It's an admission of a party opponent. It was a statement by Mr. Guzman stating that Tracy Green was out to get him. He didn't say what Tracy Green said. He just said that she was out to get him. I believe it's an admission by a party opponent. But Mr. Guzman was the person who heard the statement? Mr. Guzman said, Tracy Green, to my client, Green is out to get you. So that's a statement by Mr. Guzman. Mr. Guzman is an authorized agent of the defendant. So I believe it's an admission by a party opponent. So you're relying on an agency theory? Yes, Judge. And what is there to link that statement to a race-based animus? There's no direct evidence linking it to a race-based animus other than the fact that Ms. Green is African American and the individual who replaced my client is African American. There's no direct evidence linking it to a race-based animus. No direct evidence. But as this Court has observed in many instances, there's circumstantial evidence. In this day and age, people don't say those things anymore. They're very cautious. But nonetheless, you say that it's probative that he reports that she said that Ms. Green is out to get you. Yes, Judge. So that, just with the other circumstances you're saying, we could infer, it could be inferred that that was race-based? Yes, Judge. For many other reasons. Here, as in the Kwan v. Andalux case, there are reasons for determining Mr. Borzon have evolved over time. The Court will look in vain in the January-March performance evaluations and in Mr. Guzman's response to Mr. Borzon's appeal of his termination for any of the reasons they've cited in this case. There is no mention of the fact that there was an issue with declining revenue. He was rated as meets expectations in January and March of 2015. And the other thing is that we've pointed out that defendants have never contradicted and defendants' own documents contradict their account. In fact, AR was going, we laid it out, there are two charts on A-534 and A-535 which show there was a reduction in the number of billed AR days from 37.5 to 33.42 and that monthly cash receipts rose. And they have never responded to it. We used their own evidence against them and they've never responded to it. And it's not... And there's also evidence that the hospital's revenue continued to decline after your client was terminated. That's correct, Judge. That's correct. And Mr. Borzon is the only person in Mr. Guzman's entire tenure who he gave a needs improvement to, put on a performance plan and recommended for termination. So if these were continuing problems, why is Mr. Borzon the only person who's targeted? In terms of when Mr. Borzon submits a... You would agree that a boss would have an interest in getting rid of somebody who was incompetent. I agree, Judge. But in this case, you have Mr. Borzon. He had 30 years of experience in this field. He worked at Bronx Lebanon doing the exact same job. And defendants went and subpoenaed his performance reviews there, and it showed that he maximized the billed AR at Bronx Lebanon. So did he suddenly forget how to do his job? And were they able to discern that in 11 months? And they were able to give him a full performance review after six months? Only Mr. Borzon was the person who was responsible for declining the revenue? Hired. Judge? Mr. Guzman hired him. But two weeks later, Ms. Green was hired. So she played no role in hiring him. And she's the individual who initially, who they say recommended his termination. In terms of the retaliation court... You testified at a deposition that she didn't make the decision to terminate him and only became aware that he would be terminated after the fact. That's correct. So they have some contradictions because they also say that she did play a role in Mr. Borzon's termination. So she said, I made a recommendation to apply for another first witness on March 18, 2015. On March 15, Mr. Borzon is terminated. And they do nothing essentially to investigate. They don't interview the person, Ms. Brown-Gross, who said she witnessed it. They don't consult counsel. They don't issue a written report. They depart from their normal practices in many significant respects. So I think that also supports the claim that there was retaliation. And the lower courts said, well, you don't have any evidence that the decision-makers knew about the complaint, but this court has found that we can infer general corporate knowledge when a complaint is made. Now, there was an explanation offered by the EEO officer. She was transitioning out of the job. And so in admission, I think, in your adversary's briefing, that maybe the CEO complaint wasn't investigated as well as it should have been, but that it had nothing to do with discrimination, but just the fact that this woman was changing her job. Which is fine, but there are other people. They have—this is a—Metropolitan has $300 million in revenue. They have more than one individual who can investigate a complaint of discrimination. So I'm not blaming the individual. I'm saying that this is a complaint of discrimination. It should be—and their procedures set forth what they're supposed to do. They interview—and the witness testifies to what she does. She's going to interview relevant witnesses. She's going to look at relevant documents. She's going to consult with counsel. None of that happened in this case. They essentially interviewed one witness, and the one witness said—they said, did you make that comment? She said no. What evidence is there that the inadequacy of the investigation is tied to racial animus? The only evidence is that it was departed from their normal practice. So I proposed the HR representative, and she said, this is what I do in every investigation. She didn't do it in this case. Their explanation that she was transitioning to another role, as I said, you can assign it to another person in the HR department. So there's no direct evidence that those failures of the investigation was tied to racial animus? No, there's no direct evidence, Judge. At this point, there's also no direct evidence other than your client's testimony. You've now gone back to Brown-Gross and Davila, and none of them are able to recall this conversation. Correct. Am I right? I'm just trying to make sure I understand the record correctly. You're correct. Brown-Gross was not able to recall the conversation. I don't think Ms. Davila said she was ever contacted by EEO. They didn't meet with Ms. Collymore, and they didn't meet with April Alexander, who were two of the witnesses. Thank you. Good morning. May it please the Court. Eva Jerome from the New York City Corporation Counsel for Appellees. Despite being given many chances to improve, plaintiff was let go for chronic underperformance in many different job areas that started right out of the gate, including a lack of collaborative skills and alienating revenue cycle colleagues at a time when one would think he'd be out to impress. Plaintiff, who was the hospital's second choice between two white men to do a job plaintiff had never done before, which is to merge both inpatient and outpatient accounting. Is that your answer to the statement that he was doing this for 30 years? Yes. And that the hospital is a completely different entity than his previous hospitals. What has he been doing for 30 years, and what was the new job, and why was it different? The new job was to merge two billing programs, and he had never been responsible for both of those at the same time in his 30 years. And he was also brand new at a new corporation that had different systems. Wasn't one of the grounds for which he needs to improve dealing with fellow employees? Yes, definitely. But that doesn't have anything to do with whether you're merging the two systems or not. Apparently he was able to hold a job for 30 years in one place? No, I believe he was at different hospitals over those 30 years. As Ms. Green testified, the revenue cycle that is dependent on generating the revenue cycle is dependent on having good collaborative relationships among the different revenue departments. And that's why at the end of the summer Ms. Green tried to set him up, did set him up with counterparts at other hospitals so that he would learn better the systems. And it was to no avail, and that came out in his performance evaluation, that he did not take advantage of those opportunities that she had provided him. You mean he didn't benefit from them, or he didn't attend them? He didn't benefit from them. He did not capitalize on them. He did not make them work for him. And when did that take place, the meetings with other hospital representatives? At the end of the summer of 2014. Your adversary argues that the overheard statement that was reported, that Ms. Green was out to get his client coupled with his replacement by a person of a different race is enough, I think, is what he's saying, to support a finding that there was racial discrimination that was behind his termination. Why isn't that enough? We've said that circumstantial evidence is enough in some circumstances. True. I believe it may be enough for a prima facie case, but there was no evidence deduced that his replacement, what her qualifications were or were not, whether they were higher or lower. So that can't form the basis for an ultimate finding of discrimination. And the fact that Mr. Guzman said that Tracy's out to get you, even if admissible, doesn't reflect any racial animus whatsoever in and of itself. Instead, he relies more on a quadruple hearsay statement that is completely inadmissible for four reasons. And even in his own discovery, when he deposed... And that's the statement, he doesn't belong here. That's right. And he was inconsistent in recounting that statement and giving the date regarding that statement. Well, if it's triple hearsay, I don't know whether it's double or triple, but it's inadmissible. Correct. Correct. But the plaintiff is arguing that we've been inconsistent in the reasons why he was terminated and that... According to Guzman's testimony, he told Mr. Borzon in November that he should start looking for a new job because Greene was not happy with him. So the difference between the she's out to get you and, I mean, I don't think there's any dispute that by November he was communicating to Mr. Borzon that she's not happy with him. So there is a speed here. I mean, she comes in in May. She's newly hired. His job is to merge two systems. So where should we look in the record to see in this period from May to November that the deficiencies in his performance have become so evident? First, I want to point out that his evaluation for the first six months was a mandatory evaluation. It wasn't as though Greene said, let's put him on an evaluation schedule. The corporate policy said so. But there are many examples in the appendix that support the revenue and financial problems that were ongoing during those first six months of his employment. For example, total receipts, there's a line item where you compare the prior months. There was a decrease every month during those six months of evaluations except for one month, July, which is not in the record. Why would it have been reasonable to expect that he would be able to effect an improvement so quickly when this is a systematic problem? He's called on to merge two systems. It seems to me that that's a project that would take a couple of years. Well, it just goes to Ms. Greene's seeing that there are deficiencies in his performance from the get-go. But is there also evidence that revenue was going down before he came and was also going down after he came? I'm not sure of the details on that, Your Honor. But there's more examples in his performance evaluation. There are replete examples of how he submitted analyses and worked with colleagues, how he demonstrated a degree of anger at meetings, how he alienated his colleagues, how his imperatives at the Revenue Cycle Department were collaborative. This is all coming from his performance evaluation in January of 2015. And that he's had problems developing good relationships with colleagues. The plaintiffs, sorry, the defendants gave him many opportunities to improve. They had weekly financial meetings with him. The decreasing in revenue was constantly brought up. Mr. Guzman said that they talked about it incessantly. Under the corporate policy, if he's rated needs improvement, he's put it on a performance action evaluation plan. And just to corroborate the consistency of our position, this performance action plan talked about how we need to improve collections, how frequent the one-to-one meetings were, how we need to improve the Medicaid submission rate by 20%, how we need to ensure all canceled inpatient discharges are filed within a reasonable time frame. And that the hospital was ranked among the worst in something called DNFB, discharge not final bill. The point is that we have not, this is not a case like Kwan versus Anderlecht, where we've given diametrically opposed reasons for his being terminated from the position of patient financial, associate director of patient financial services. Which is more akin to Roche v. NYT Holdings, which is variations on the theme. This performance was abysmal from the start for the entire tenure that he was there. In Kwan, there were two completely different reasons given. One was that there was a change in corporate focus, and one is that she had a bad performance evaluation. Just as the court is telling Chen Chen, there's no evidence that any of, there's no reasonable juror could infer that race discrimination was a motivating factor in plaintiffs being let go, or that his EEO complaint was a but-for cause or played any role in his termination. And I want to also emphasize the point that by not briefing the New York City human rights law or the New York State's human rights law or the 1981 or 1983 claims, those are all waived. But why is that so? I mean, if we were to find, based on his Title VII arguments, that his Title VII claims survived the standards applied in the New York State, in New York City, would kind of, if so, just by that very fact. That's true, but if he revived. But if you were to find that he didn't establish Title VII, the counseled client shouldn't get the benefit of the lower standard of the New York City human rights law if he doesn't brief it. There's not one mention of any pattern or practice with respect to the 1981 or 1983 claims. And I want to point out, too, that there's no piecemeal analysis done by the district court. As a necessity, court needs to lay out the different things that are being alleged as pretextual. And Carlson v. NIST, it could be. Why isn't an argument that the case is sufficient to survive a tougher standard sufficient to demonstrate that it survives a more lenient standard? No, I agree with you on that point, but I'm. Well, if you do, then I'm not sure where the waiver comes from. If the waiver comes from if the court were to find that he did not establish discrimination under Title VII, that he doesn't then get the benefit of trying to allege discrimination under the lower standard because he did not brief it. Thank you. That's all. Thank you. Just briefly on rebuttal. If the court reviews Mr. Guzman's memorandum on A438-40, that's his response to Mr. Borzon's appeal. And he's going to be laying out why Mr. Borzon was terminated. There's absolutely no reference in there to Metropolitan's revenue, its AR, net budget variance, any of those topics. The only reference to the revenue cycle is to say that Mr. Borzon sought to outsource certain aspects of the revenue cycle operations. So it's diametrically opposed with what they're claiming before the court, which was that declining revenue was the reason why he was let go or one of the reasons why he was let go. With regard to merging the inpatient and outpatient, the court will note that that has not happened. More than two years after Mr. Borzon's termination, it had not yet been completed. That's defendants admitted that at 289, that's at A677. So they haven't fully been merged. So the idea that somehow... What does that show except that whoever they hired to replace him can't do the job either? Well it shows if they're trying to demonstrate that he somehow failed in that, that it was a very difficult... He failed in it. The fact that somebody else failed doesn't mean that he did not fail. It may be that he was competent and failed, in which case they probably shouldn't have fired him, but the fact that he was failing could support an inference that he was incompetent. I think it just shows it was a very difficult and complicated task. Yes. That's all I think it shows, Judge. In terms of... You asked Judge what Mr. Borzon did at Bronx-Lebanon. He did the same job. His job there was to maximize accounts revenue, receivable management, including the bad debt process, and he succeeded. He succeeded in that over the course of four years. Did he have a task such as merging these two functions that the city outlined? Not that specific task, but his task was in general to help the hospital collect money, to make sure that they collected enough revenue over the course... Even if at the highest level it was to help the hospital succeed, one can imagine that the specifics of the task and the culture in which he was operating would have been different potentially. I think they're very similar, Judge. I mean, you're dealing with Medicaid patients, you're dealing with people who may not have insurance, you're trying to make sure that their information is correctly recorded, you're trying to make sure that the hospital collects revenue, it's a similar kind of patient population. So I think it's a similar scenario. It's some evidence that he was qualified to do the job. I'm not saying it wins the day, but it is evidence as such. So what you're left with is essentially subjective. Subjective statements. He didn't collaborate with colleagues. Colleagues didn't like him. And that's contradicted by when Mr. Guzman hired him, 11 months prior to his termination he said he has an agreeable personality, has 30 years of experience in the revenue cycle. He acknowledged that he was qualified and acknowledged that he should be able to do the job. So what changed over the course of 11 months? What changed was that Ms. Green was hired. And Ms. Green was the driving force in getting him to be terminated. Thank you. Thank you both. This matter is under advisement.